IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO.  5:15-CV-389-FL

| | | |
|---|---|---|
| ROSE OIL COMPANY, INC.,<br>ROSEMART, INC., and ROSEMART<br>PROPERTIES, LLC, | )<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | ORDER |
| PNC BANK, NATIONAL<br>ASSOCIATION, as successor by<br>merger to RBC Bank (USA), | )<br>)<br>)<br>) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion to dismiss, pursuant to Federal

Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted.  (DE

7).  Plaintiffs responded and defendant replied.  Plaintiffs also move for a hearing on the motion.

(DE 24).  In this posture, the issues raised are ripe for ruling.  For the reasons that follow,

defendant's motion to dismiss is granted and plaintiffs' motion for hearing is denied.

## STATEMENT OF THE CASE

Plaintiffs filed this action on August 13, 2015, asserting that defendant's predecessor, RBC

Bank USA ("RBC"), fraudulently induced plaintiffs to execute financial instruments, called interest

rate swaps, in connection with the financing of plaintiffs' gasoline and fuel distribution business.

Plaintiffs assert that defendant subsequently forced plaintiffs out of such swaps and other loan

arrangements secured by the same collateral in order to collect improper termination fees.  Plaintiffs

assert claims of fraud, negligent misrepresentation, and seek a declaratory judgment arising from

defendant's conduct with respect to the loan arrangements.  Plaintiffs assert claims of breach of fiduciary duty, fraud, constructive fraud, negligent misrepresentation, unjust enrichment, and unfair and deceptive trade practices, arising from the interest rate swap transactions.

Plaintiffs seek compensatory damages, punitive damages, treble damages, costs, attorney's fees, prejudgment interest, post judgment interest, declaratory judgment, jury trial, and any other relief the court deems just and proper.  On May 20, 2015, defendant filed the instant motion to dismiss the entire complaint for failure to state a claim.

## STATEMENT OF THE FACTS

The facts as alleged in the complaint may be summarized as follows:

On June 16, 2008, plaintiffs entered into a variable-rate loan (the "term loan") with RBC, defendant's predecessor in interest, to pay off existing debt to an earlier creditor.  (Compl. ¶ 19, DE 1-1).[1]  The term loan was secured by deeds of trust and assignments of rents on certain properties owned by plaintiffs in Vance, Granville, Franklin, Wilson, and Wake Counties, North Carolina. (Id.).

On the same date, June 16, 2008, RBC extended a variable-rate line of credit ("the "line of credit") to plaintiffs for the amount of $1,250,000.00, which plaintiffs used for working capital.  (Id. ¶ 25). The line of credit was renewed four times, and on two of those occasions, the documentation

---

[1] The complaint refers to all three plaintiffs collectively as "Rose Oil."  (Compl. ¶1).  All three plaintiffs are parties to the term loan and other loan arrangements referenced in the complaint, (DE 8-10, 11, 13), whereas plaintiff Rose Oil Company, Inc., ("Rose Oil") is the only plaintiff named as party to the swaps. (DE 8-2, 3, 4, 5, 6). At all times relevant to the complaint, the president of plaintiff Rose Oil, Sam Watkins Jr. ("Watkins"), was president of plaintiff Rosemart, Inc. and a member/manager of plaintiff Rosemart Properties, LLC.  (Compl. ¶12). In addition, other officers who executed the swap documents are also officers for Rosemart, Inc. and Rosemart Properties LLC. (See Compl. ¶12; DE 8-2, 3, 4, 5, 6).  According to the complaint, Watkins "handled almost all aspects of Rose Oil's relationship with RBC and defendant." (Compl. ¶12).  Accordingly, when discussing arguments raised and the parties that entered into the loan arrangements, the court generally will refer to plaintiffs collectively, as referenced in the complaint.  However, the court will differentiate the plaintiffs where required by the context of the discussion or documents referenced therein.

memorializing the renewal was not dated until after the previous line of credit had matured.  (Id.).

Despite this, the parties acted as if the line of credit had not lapsed. (Id. ¶¶ 24, 25).

In early 2008, when plaintiffs and RBC were discussing these loan arrangements, RBC's

representative presented "interest rate swaps" (the "swaps") as an opportunity for plaintiffs to hedge

against volatility in the variable interest rates specified in the loan and line of credit.  (Id. ¶¶ 1, 30).

Interest rate swaps are complex financial instruments, described in the complaint as follows:

> An interest rate swap is a risk-avoidance product that is used, among other purposes,
> to hedge against the risk that commercial borrowing rates will increase and as a
> mechanism for hedging a borrower's risk of rate fluctuations on a floating rate loan
> over the term or tenor of that loan by "swapping" that floating rate for a
> commercially reasonable effective fixed rate (or swap rate). To provide a complete
> hedge of a floating rate to an effective fixed rate, an interest rate swap functions as
> follows: One party pays a floating rate of interest, usually the 30-day or 90-day
> London Interbank Offered Rate ("LIBOR"), plus a credit spread, on a notional
> principal amount. The counterparty pays a fixed interest rate on the same notional
> amount. Those payments are swapped by the party and the counterparty on periodic
> settlement dates (usually monthly) over the term or tenor of the swap. If an
> amortizing loan is being hedged, the notional amount of the swap will usually
> decline in the same increments as the principal amount of the floating rate loan being
> amortized. When a client borrows funds at a variable or floating rate, an interest rate
> swap can thus be used to synthetically fix the rate. The client pays the bank the fixed
> swap rate and the bank pays the client the same floating rate as the client is paying
> [its creditor] on its loan. Because the two variable rate payments (by the bank to the
> client inside the swap and by the client to the [creditor] on the loan) cancel one
> another out, the client is effectively paying the fixed swap rate on the loan. The fixed
> rate, therefore, is effectively the price for the interest rate swap.

(Id. ¶ 14); see also Caper Corp. v. Wells Fargo Bank, N.A., No. 7-12-CV-357-D 2013 WL 4504450,

at *1 n.1 (E.D.N.C. Aug. 22, 2013) (summarizing concept of interest rate swaps).

RBC and plaintiff Rose Oil ultimately entered into three such swaps, which were meant to

hedge the volatility in the variable interest rates of the loans.  (Compl. ¶¶ 14, 36, 114, DE 1-1).  On

June 16, 2008, the same day that plaintiffs entered into the term loan and line of credit, plaintiff Rose

Oil executed a swap master agreement and schedule, which governed the subsequent swap

3

agreements. (Compl. ¶¶ 30, 32, DE 1-1; DE 8-2, 3). Under the terms of the master agreement and schedule, plaintiff Rose Oil and RBC entered into the first swap on June 17, 2008 ("Swap I"), which was for a notional amount of $2,000,000.00, was entered into on June 17, 2008, an effective date of June 12, 2008, and terminated on July 1, 2015. (DE 8-5). The second swap ("Swap II"), for a notional amount of $2,350,000.00, was entered into on June 17, 2008, had an effective start date of June 12, 2008, and terminated on April 7, 2011. (DE 8-4). The third swap ("Swap III"), for a notional amount of $1,500,000.00, was entered into on June 12, 2009, replaced Swap II when it activated on May 1, 2011, and was scheduled to terminate on May 1, 2019. (DE 8-6). Swaps II and III mirrored the terms of an interest rate swap plaintiff Rose Oil had entered into previously with Bank of America. (Compl. ¶ 34, 35). The timing of effective dates and expiration dates of the swaps did not match up to the terms of the terms of the term loan or lines of credit. (Id. ¶ 36).

RBC constructed the swaps by obtaining fixed rate loans from the interest swap market, a market not available to plaintiffs, and then providing a somewhat higher fixed rate to plaintiff Rose Oil in exchange for payments, fixed to LIBOR, made by RBC to plaintiff Rose Oil. (Id. ¶ 88). The difference between the rate provided to plaintiff Rose Oil and the rate obtained by RBC from the swap market generated a profit for RBC and defendant estimated by plaintiffs to be $115,500.00. (Id. ¶ 97, 98). RBC did not disclose this profit or the lower rate at which they had obtained the fixed rate loan to plaintiffs. (Id.).

In March 2012, defendant acquired and merged with RBC. (Id. ¶ 53). In a meeting on April 18, 2012, defendant's employee orally assured plaintiffs that the line of credit would be extended as it had in the past. (Id. ¶ 54). On June 16, 2012, the line of credit matured. (Id. ¶ 59). Instead of paying the amount owed, plaintiffs requested a $400,000.00 advance on the line of credit on June

4

22, 2012. (Id. ¶ 59, 66). After a series of communications in which defendant expressed an unwillingness to keep plaintiffs' account, plaintiffs informed defendant that it needed four months to find a new bank to meet its financing needs. (Id. ¶ 67).

On October 16, 2012, RBC informed plaintiffs that unless an amendment to the loan documents was entered into with personal guarantees, RBC would initiate foreclosure proceedings. (Id. ¶69). Plaintiffs and defendant entered into an "Amendment to Loan Documents" that day. (Id. ¶ 69). The Amendment to Loan Documents provides that plaintiffs have:

> executed and delivered to [defendants] . . . one or more promissory notes, letter agreements, loan agreements, security agreements, mortgages, pledge agreements, collateral assignments, and other agreements, instruments, certificates and documents, some or all of which are more fully described on attached Exhibit A, which is made part of this amendment (collectively as amended from time to time, the "Loan Documents") which evidence or secure some or all of the [plaintiffs'] obligations to the [defendant] for one or more loans or other extensions of credit (the "Obligations").

(Compl. Ex. E, DE 1-1 at 64). The Amendment to Loan Documents provides then provides that "Certain of the Loan Documents are amended as set forth in Exhibit A." (Id.). The Amendment to Loan Documents also provides:

> To induce [defendant] to enter into this Agreement, the Borrower waives and releases and forever discharges the [defendant] and its officers, directors, attorneys, agents, and employees from any liability, damage, claim, loss, or expense of any kind that it may have against the [defendant] or any of them arising out of or relating to the Obligations.

(Id. at 65).

At the time plaintiffs executed the Amendment to Loan Documents, it did not include as an attachment any "Exhibit A." (Compl. ¶70). Three days later, plaintiffs received from defendants a document captioned "Exhibit A to Amendment to Loan Documents" ("Exhibit A") on October 19, 2012. (Id.) Exhibit A states: "The 'Loan Documents' that are the subject of this Amendment

5

include the following (as any of the foregoing have previously been amended, modified, or otherwise supplemented)." (Compl. Ex. G, DE 1-1 at 70). Exhibit A lists, among other documents, a "Promissory Note from Borrower to Lender dated June 16, 2008 ..." a "Security Agreement dated June 16, 2008," a "Business Loan Agreement dated June 16, 2008" and "[a]ll other documents, instruments, agreements, and certificates executed and delivered in connection with the Loan Documents listed in this Section A." <u>Id.</u> Exhibit A then states:

> [t]he Loan Documents are amended as follows: ... the maximum principal amount of the Note shall be reduced from $1,250,000.00 to $1,000,000.00, and the total advances permitted under the Note shall not exceed this amount . . . . Accrued interest will be due and payable on the first day of each month, beginning with the payment due on October 1, 2012. The outstanding principal balance and any accrued but unpaid interest shall be due and payable on the Expiration Date, which shall mean the date until which Bank will be willing to make advances to Borrower, or such later date as may be designated by Bank by written notice to Borrower. The current Expiration Date is February 15, 2013.

(Compl. Ex. G, DE 1-1 at 71). The Note referred to is the promissory note securing the line of credit. (Compl. Ex. D, DE 1-1 at 60). Finally, Exhibit A states that "[t]he Bank's willingness to agree to the amendments set forth in this Amendment is subject to the prior satisfaction of the following conditions," including "[e]xecution by all parties and delivery to the Bank of this Amendment . . . ." (<u>Id.</u> at 71).

Plaintiffs assert that defendant represented that in signing the Amendment to Loan Documents, plaintiffs would be agreeing to an extension of otherwise unmodified loans to February 15, 2013, and that plaintiff signed on the basis of those representations. (Compl. ¶ 71). Plaintiffs additionally assert that RBC did not inform plaintiffs that "in signing the Amendment to Loan Documents, [plaintiffs] were agreeing to any other material terms or material changes to the loans, including any reduction in the line of credit." (<u>Id.</u>).

6

After receiving Exhibit A, plaintiffs did not draw further on the line of credit, although they continued to make the regular interest payments required by Exhibit A until January 22, 2013, when they were able to refinance their loans. Having refinanced their loans, plaintiffs asked to be released from the interest rate swaps, as the loans had been paid in full. Defendant required that plaintiffs pay a termination fee of $515,060.00, which plaintiffs paid under protest.

## COURT'S DISCUSSION

A.     Standard of Review

A motion to dismiss under Rule 12(b)(6) determines only whether a claim is stated; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). A claim is stated if the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted). In addition, a motion to dismiss under Rule 12(b)(6) may also be appropriate "when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996).

B.    Analysis:

1.    Waiver

Defendant first asserts that plaintiffs' claims are barred by the waiver in the Amendment to

Loan Documents signed by plaintiffs on October 16, 2012:

> The Borrower waives and releases and forever discharges the Bank and its officers,
> directors, agents, and employees from any liability, damage, claim, loss, or expense
> of <u>any kind that it may have against the Bank or any of them arising out of or relating
> to the Obligations</u>.

(Compl. Ex. E, DE 1-1 at 64) (emphasis added).

Although plaintiffs do not dispute that they signed the Amendment to Loan Documents

containing this waiver, plaintiffs argue that the Amendment to Loan Documents, and therefore the

waiver, is unenforceable due to a misrepresentation amounting to fraud by defendant.  Defendant

asserts that plaintiffs are estopped from rescinding the Amendment to Loan Documents because

plaintiffs both took too long to object to these failings in the contract, and accepted benefits

conveyed by the allegedly fraudulent contract.  Plaintiffs and defendant agree that if enforceable,

the waiver in the Amendment to Loan Documents applies to bar claims five, six, eight, and nine, but

disagree about whether the waiver applies to the remaining claims.  The court addresses below

separately the issues of enforceability and scope.

a.      Enforceability

Under North Carolina contract law,[2] "[i]f a misrepresentation amounting to fraud is made in any matter embraced in the release the instrument is vitiated as a whole, and not merely as to the matter to which the misrepresentation relates; every portion and clause of a release voidable for fraud in its inception is unenforceable and not binding." Cowart v. Honeycutt, 257 N.C. 136, 142 (1962) (quoting 76 C.J.S. Release § 27 at 651). Thus, if there was a misrepresentation amounting to fraud in the formation of the contract, the defrauded party has the power to rescind the contract as void. See id.

However, the North Carolina Supreme Court recognizes estoppel by benefit, under which "a party who accepts a transaction or instrument and then accepts benefits under it may be estopped to take a later position inconsistent with the prior acceptance of that same transaction or instrument." Whitacre Partnership v. Biosignia, 358 N.C. 1, 18 (2004) (citing Brooks v. Hackney, 329 N.C. 166, 172 n. 3 (1991)).  While a simple failure to act promptly may not be sufficient to waive the power to rescind, "if, after discovering the fraud, the injured party does some act in recognition of the contract, his power to rescind is then at an end." Bolich v Prudential Insurance Co. of America, 206 N.C. 144, 173 S.E. 320, 327 (1934).

As a threshold matter, plaintiffs are estopped from rescinding the contract due to the assertions in their own complaint regarding the actions they took after discovering the alleged fraud.

_____

[2]  The Amendment to Loan Documents provides that it is governed by the laws of the state where defendant's office indicated in the Loan Documents is located, here North Carolina.  (DE 1-1 at 65).  Furthermore, it is undisputed that "the principle of lex loci contractus mandates that the substantive law of the state where the last act to make a binding contract occurred. . . controls the interpretation of the contract," and procedural terms therein are governed by the law of the forum, North Carolina. Fortune Ins. Co. v. Owens, 351 N.C. 424, 428 (2000).  Therefore, the court applies North Carolina law to determine enforceability and interpretation of the Amendment to Loan Documents.

As summarized in the statement of facts previously, on or about June 22, 2015, plaintiffs sought $400,000.00 on their line of credit. (Compl. ¶ 59, DE 1-1). Defendant responded in a series of communications wherein it refused the extension, noted plaintiffs were already in default, told plaintiffs to find a different source of finance, and threatened foreclosure. (Id. ¶ ¶ 60-68). On or about October 16, 2012, defendant informed plaintiffs that if they signed the Amendment to Loan Documents on that day, the line of credit would be extended until February 2013. (Id. ¶ ¶ 69-71). Within three days after signing the Amendment to Loan Documents, plaintiffs received Exhibit A on October 19, 2012, which included, among other things, three key provisions. First, it provided that the line of credit would be reduced to $1,000,000.00 from $1,250,000.00. (DE 1-1 at 71). Second, it provided that the expiration date of the line of credit would become February 15, 2013. (Id.). Third, it provided that plaintiffs would make monthly interest payments until the expiration of the line of credit. (Id.; see also DE 1-1 at 67).

Because the first key provision, reduction in line of credit, forms the basis of the fraud claim, the receipt of Exhibit A is the latest possible point at which plaintiffs could have discovered the alleged fraud, as it documents the reduction in available credit. After discovering the alleged fraud, however, plaintiffs continued to make monthly interest payments according to the new schedule until January 22, 2013, at which point they secured a new source of financing and paid off the loan and line of credit in full. (See Compl. ¶ ¶ 41, 79).

Prior to the Amendment to Loan Documents extending the loan to February 2013, plaintiffs were only required to make interest payments until September 2012. (Id. at ¶ 64). The interest payments for the months of October 2012, November 2012, December 2012, and January 2013 are described in Exhibit A, and were therefore made after plaintiffs discovered the alleged fraud. By

10

making those interest payments on the new schedule after having discovered the alleged fraud, plaintiffs "act[ed] in recognition of the contract" and are estopped from rescinding the contract. <u>Bolich</u> 173 S.E. at 327.

Plaintiffs argue that they received no benefit from the Amendment to Loan Documents, or, at the very least, Exhibit A. To support this argument, plaintiffs assert that what they wanted out of the agreement was the ability to continue to draw from the Line of Credit, and to withdraw the full $400,000.00 they allege should have been available, instead of the $150,000.00 remaining after Exhibit A reduced the line of credit by $250,000.00. Due to this decrease, plaintiffs assert that the extension provided was useless, and that is why they did not avail themselves of it.

Contrary to these protestations, plaintiffs did receive a benefit from Exhibit A. It is clear from the face of the complaint that at least one of the things plaintiffs desired from the agreement was enough time "to find another bank to fulfill Rose Oil's financing needs." (Compl. ¶ 67). Plaintiffs, all of whom had signed the loan and line of credit, had previously been required to find a new source of finance and pay off their remaining principal by September 2012. (<u>Id</u>. ¶ 68). However, they were given until February 15, 2013 by the Amendment to Loan Documents, and the specific extension is provided for in Exhibit A. (<u>See</u> DE 1-1 at 71). This extension conferred a benefit on plaintiffs by allowing them to delay repayment of the loan, thereby avoiding default. By asserting that it was the threat of foreclosure that compelled them to enter into the Amendment to Loan Documents, plaintiffs demonstrate that they benefitted from the extension. (Compl. ¶¶ 67-69). While plaintiffs attempt to argue that they did not receive everything they wanted in Exhibit A, they are estopped from doing so by their acceptance of this benefit and ratification of the contract.

In sum, because plaintiffs are estopped from alleging fraud, the waiver is valid and claims five, six, eight, and nine must be dismissed.

   b.   Scope

Plaintiffs assert that even if the waiver is enforceable, it is of limited scope and does not apply to plaintiffs' interest rate swap claims, characterized by plaintiffs as claims one, two, three, four, seven, and ten. Plaintiffs note that the waiver only encompasses those claims "arising out of or related to the Obligations," whereas the interest rate swap claims are asserted to be independent of the Obligations. Defendant asserts that while "Obligations" refers to the term loan and line of credit, all of the claims are nevertheless "related to" the Obligations and are therefore within the scope of the waiver. (Brief for Defendant, DE 8-1 at 15, 17)

In determining the scope of the waiver, the court turns first to applicable principles of contract interpretation under North Carolina law. "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." State v.Phillip Morris USA Inc., 323 N.C. 623, 631 (2009) (internal citation and quotation omitted). "Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be." Crockett v. First Fed. Sav. & Loan Ass'n, 289 N.C. 620, 631 (1976). Language is ambiguous if it creates "a state of uncertainty, and refers to nothing extrinsic by which it might be identified with certainty." Lane v. Coe, 262 N.C. 8, 13 (1964). Whether the language is ambiguous is a question of law for the court to decide, as is the interpretation of unambiguous language. See Carlton v. Anderson, 276 N.C. 564 (1970). Intent is derived from the contract as a whole, not a particular contractual term. See Jones v. Casstevens, 222 N.C. 411, 413-414 (1942).

The waiver uses plain and ordinary terms to describe a broad release of claims related to the Obligations, which are defined in the Amendment to Loan Documents as plaintiff's "obligations to the Bank for one or more loans or other extensions of credit." (Compl. Ex. E, DE 1-1 at 64). Both parties understand this as referring to the term loan and the line of credit. (Brief for Defendant, DE 8-1 at 15; Brief for plaintiff, DE 19). Apart from the reference to "the Obligations," the waiver uses language expressing an intention of unqualified breadth, as it applies to "any liability, damage, claim, loss, or expense of any kind against the Bank . . . arising out of or relating to" the Obligations. (Compl. Ex. E, DE 1-1 at 64).

By using the phrase "arising out of or relating to," the waiver sets forth two alternative, separate, delineations of scope. On the one hand, "arising out of" signifies that the claim originates with the Obligations themselves. By contrast, "relating to" signifies a broader connection between claims asserted and the Obligations. Because "relating to" has a broad meaning in the context of the Amendment to Loan Documents, the court focuses its analysis on the application of "relating to."

"Relating to" is inherently indeterminate. "If relate to were taken to the furthest stretch of its indeterminancy . . . [it] would never run its course for really, universally, relations stop nowhere." New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655 (1995). Courts, thus, have developed limiting principles for defining the scope of "relating to" depending on the context in which the phrase arises.

For example, where a provision requires that a claim "relate to" an underlying document, agreement, or obligation, the Fourth Circuit has taken into account "the specific relationship created by the relevant agreement." Wachovia Bank, Nat. Ass'n v. Schmidt, 445 F.3d 762, 769 (4th Cir.

13

2006);  see also Hammaker v. Brown & Brown, Inc., 214 F.Supp.2d 575, 577 (E.D.V.A. 2002) (finding a claim "related to" the contract to which a waiver applied because the claim would not exist but for the relationship that contract governed).   To fall within the scope of such a provision, a claim must "derive directly from the specific relationship created by the relevant agreement." Wachovia, 445 F.3d at  769.  Similarly, the Fourth Circuit has looked to whether "a significant relationship exists between the claim" and the underlying referenced agreement.   American Recovery Corp. v. CTI, 96 F.3d 88, 94 (4th Cir. 1996) (internal citation omitted).

Such an interpretation is appropriate in the context of the waiver in this case, where the waiver references the Obligations that together create a specific commercial banking relationship between the parties.[3]  Therefore, in considering the scope of the waiver in this case, the court will consider whether plaintiffs' claims "derive directly from the specific relationship created by" the Obligations, or whether a "significant relationship exists between the claim" and the Obligations.[4] The court turns to apply this interpretation now to the particular claims for which a dispute of coverage by the waiver exists.

---

[3]  While American Recovery and Wachovia Bank also involved application of a presumption in favor of arbitration in the event of "any doubts concerning the scope of arbitrable issues," the court does not apply any such presumption in this case, but rather relies upon American Recovery and Wachovia Bank to aid in interpretation of the phrase "relating to" in the context of an underlying agreement. See American Recovery, 96 F.3d at 94; Wachovia Bank, 445 F.3d at 769.

[4] Plaintiffs argue that the Obligations and swaps were not related within the context of the release because the swaps were "separate and distinct transactions."  Plaintiffs cite Bank of America v. Hanna, in which the Eighth Circuit found "even though [the] swap agreement was used to fix artificially the interest rate on the ... loan, the swap and loan agreements were separate and distinct transactions." Bank of America, N.A, v. JB Hanna, LLC, 766 F.3d 841, 849 (8th Cir. 2014).  However, the Eighth Circuit in Hanna used "separate and distinct" to mean the documents "did not constitute a single agreement," which has a very different meaning from "not relating to."  Id.  The "separate and distinct" versus "single agreement" analysis was not used to evaluate whether the contracts were related for the purpose of a waiver, but rather was used separately to determine whether breach of one contract constituted breach of the other. See id. at 852. Indeed, rather than determine the documents were not related, the swaps and loans were referred to as "related transactions."  Id.  In sum, Hanna is inapposite, and plaintiffs' argument based thereon is without merit.

14

####### i.     Claim one

Claim one is for breach of fiduciary duty, and alleges that defendant's superior knowledge and expertise with respect to swaps allowed it to "dominate and control" the relationship with plaintiffs, thereby creating a fiduciary duty.  Defendant allegedly breached this fiduciary duty by advising plaintiffs to enter into the swaps with certain terms, such as allegedly high rates and mismatched tenors with the loans the swaps were meant to hedge, and then terminating the line of credit to extract termination fees from plaintiff.  While claim one deals with the swaps, it also discusses and incorporates the line of credit referenced in the Obligations. (Compl. ¶¶ 112, 115-119, DE 1-1) ("The Bank breached that fiduciary duty by virtue of the conduct described above, including but not limited to . . . inducing Rose Oil into believing its <u>line of credit</u> would be extended in order to contrive a purported default on the <u>line of credit</u>.") (emphasis added).  While this claim does not arise entirely from the Obligations, it nonetheless has a direct and significant relationship to the Obligations, and thus relates to them.  Therefore, claim one is within the scope of the waiver, and must be dismissed.

####### ii.     Claim two

Claim two is for constructive fraud, and alleges that defendant took advantage of an alleged position of trust with regard to the loans and swaps.  (<u>Id.</u> ¶ 123) ("With regard to the Loans and the Swaps, the Bank took advantage of its position of trust with Rose Oil in order to benefit the Bank, as alleged").  Plaintiffs allege that in committing constructive fraud, defendant extracted payments through the termination fees collected under the Swap agreement when the line of credit terminated. This claim is therefore plainly related to the Obligations, which include the line of credit and term loan.  Therefore, claim two must be dismissed.

15

iii.     Claims three, four, and seven

Claims three, four, and seven are respectively for fraud, negligent representation, and unjust enrichment. All three arise from allegations that defendant negligently or intentionally misled plaintiffs about the interest rates offered on the Swaps and thereby extracted a profit. However, the fixed interest rates provided were intended to replace and provide insurance against "fluctuating rates in the Loans," and neither they nor the associated claims would exist were it not for the Obligations. (Id. ¶ 81, 82). Thus, the claims relate to the Obligations, and are therefore barred by the waiver. See Hammaker, 214 F.Supp.2d at 577. Therefore, claims three, four, and seven must be dismissed.

iv.     Claim ten

Claim ten seeks damages under the unfair and deceptive trade practices act. It alleges generally that the actions of defendant over the course of their dealings with plaintiffs constitute an unfair and deceptive trade practice. On its face, this claim is based on the conduct underlying the previous nine claims. Where the previous nine claims relate to the Obligations, claim ten must also. Therefore, claim ten must be dismissed.

In sum, the waiver acts as a comprehensive bar to plaintiffs claims, as all of plaintiff's claims either arise from or are related to the Obligations. However, where the scope of the waiver is disputed sharply, the court also addresses claims one, two, three, four, seven, and ten on the merits, as set forth below.

2.      Merits

        a.      Overcharges and Hidden Fees: Claims Three, Four, and Seven

Plaintiffs assert that RBC Bank overcharged them on the swaps, and asserts that recovery

is due under theories of constructive fraud, negligent misrepresentation, and unjust enrichment.

As a threshold matter, plaintiffs' theory of unjust enrichment is unsound.  A claim of unjust

enrichment "is a claim in quasi contract or a contract implied in law . . . . [which] is not based on

a promise, but is imposed by law to prevent an unjust enrichment."  Booe v. Shadrick, 322 N.C. 567,

570 (1988).  "If there is a contract between the parties the contract governs the claim and the law

will not imply a contract."  Id.  In the instant case, where there are contracts between the parties, the

contracts govern the claim and the law will not imply a contract.

Plaintiffs' theories of constructive fraud and negligent misrepresentation are predicated on

three assertions.  First, plaintiffs allegedly were assured the swaps would be offered at "market

rates."  (Compl ¶ 127).  Second, the swaps allegedly were offered to plaintiffs at fixed rates 50 and

68 points above the international swap broker rates available to RBC Bank.  (Id. ¶¶ 96, 97, 128).

Third, the rate at which the swaps were offered allegedly was greater than the market rate. (Id. ¶ 102,

103).

The flaw in plaintiffs' overcharge argument is identical to the flaw in the claim in Caper

Corp. v. Wells Fargo Bank, N.A., which was described as follows:

> Caper's claim that Wells Fargo had a duty to disclose the income the bank would make on
> the Swap Agreement is ridiculous. As discussed, Wells Fargo was not acting as Caper's
> fiduciary. Private parties to an arm's-length business transaction have no duty to disclose
> their potential income or profits to each other.

17

Caper Corp. v. Wells Fargo Bank, N.A., No. 7-12-CV-357-D, 2013 WL 4504450 at *1 n.1 (E.D.N.C. Aug. 22, 2013), aff'd Caper Corp. v. Wells Fargo Bank, N.A., 578 Fed.Appx. 276 (4th Cir. 2014).

As in Caper, "the complaint is completely devoid of any allegation that [bank] ever explicitly offered [plaintiff] the interdealer broker market rate, or even intimated that the interdealer broker market rate was, in fact, the 'market rate' . . . to which it referred." Caper, 578 Fed. Appx. at 285. Notably, plaintiffs "[do] not allege that [defendant] or any bank representative specifically offered [plaintiff] the interdealer broker market rate," or that the "market rate" offered was the interdealer broker market rate. Id. Nor do plaintiffs allege that defendant represented that defendant would not turn a profit, or would only turn a limited profit on the swaps. Absent such a basis, plaintiffs' otherwise unsupported belief is insufficient to support this claim.

Moreover, plaintiffs' claim is fundamentally self-defeating. Plaintiffs' complaint acknowledges two factors that indicate "market rate" was not understood by either plaintiffs or defendant to mean the interdealer broker market rate. First, plaintiffs acknowledge both that the Swap rates received plaintiffs were tailored to its "creditworthiness," (Swap schedule § 1; DE 8-3), but the interdealer broker market was only available to large financial institutions. Second, plaintiffs were aware that RBC Bank would receive some profit over and above the interdealer broker market rate; indeed, plaintiffs expected that defendant would turn "a modest, reasonable profit." (Compl. ¶ 127). It is logically inconsistent for plaintiffs to believe they were receiving the market rate, that the interdealer broker market rate was the market rate, and that RBC Bank would obtain a profit by charging them more than the interdealer broker market rate. Plaintiffs assert that they were aware that such a profit existed, but that the fair market rate would have been closer to the interdealer

broker market rate, and "no more than $10,000" higher. (Id.). However, this allegation is not supported by any representation by defendant, nor have plaintiffs provided any other basis for suggesting this is a reasonable interpretation.

For the foregoing reasons, plaintiffs have failed to allege any facts supporting the position that they were the rate they were provided was anything other than the market rate. That the market rate was other than plaintiffs allegedly anticipated is not sufficient to support claims of fraud, constructive fraud, or unjust enrichment.

Therefore, to the extent that the waiver may not apply to claims three, four, and seven, they must in any case be dismissed for failure to state a claim.

      b.     Fiduciary Duty: Claims One, Two, Three, Four

In claims one, two, three, and four of its complaint, plaintiffs allege defendant committed a breach of fiduciary duty, constructive fraud, negligent misrepresentation with respect to the swaps, and negligent misrepresentation with respect to the line of credit. All four of these claims require plaintiffs to demonstrate that they were owed a fiduciary duty by defendant; claims of negligent misrepresentation require that the fiduciary duty in question is the duty of care.[5] Dalton v. Camp, 353 N.C. 647, 650 (2001) ("For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties"); Forbis v. Neal, 361 N.C. 519, 526-527 (2007) ("constructive fraud . . . arises where a confidential or fiduciary relationship exists"); Raritan River Steel Co. v. Cherry, Bekaert & Holland, 322 N.C. 200, 206 (1988) ("The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care.").

_____

[5] Claim six also is also for negligent misrepresentation, and therefore is dependent on the existence of a duty of care. The court does not address this claim as the parties do not dispute whether it falls within the scope of the waiver.

19

Under North Carolina law, a fiduciary relationship in a debtor-creditor relationship arises "only when the evidence establishes that the party providing financing to a corporation completely dominates and controls its affairs." Edwards v. Northwestern Bank 250 S.E.2d 651, 662 (N.C. App. 1979); see also Taylor v. Standard Gas & Electric Co., 306 U.S. 307 (1939). While determination of a fiduciary relationship is generally a question of fact to be determined by the jury, where plaintiffs fail to disclose facts supporting the existence of a fiduciary relationship, dismissal is proper. See Lynn v. Federal Nat. Mortg. Ass'n, __ N.C. App. __, 760 S.E.2d 372, 375, 376 (2014).

In the instant case, plaintiffs' argument is that because "the Bank stood in a dominant position relative to Rose Oil in multiple respects," and they did not have a "typical lender-borrower relationship," RBC Bank owed plaintiffs a fiduciary duty. (Compl. ¶ 118). Plaintiffs provide three such "respects" in which RBC Bank allegedly dominated or otherwise had an atypical relationship with plaintiff. First, plaintiffs assert that "the Bank cultivated a relationship of trust and confidence with Sam Watkins and others at Rose Oil, who received and relied on the superior knowledge and advice of . . . the Bank." (Id. ¶ 110). Plaintiffs further assert that because "Rose Oil relied on [the bank] to disburse necessary operating funds via draws on the line of credit" the Bank had "the ability to dominate and influence Rose Oil's viability." (Id. ¶ 116). Plaintiffs additionally assert that a fiduciary duty was owed, because "[w]ith respect to the swaps, which were unlike regular debt instruments . . . . the Bank's superior knowledge and expertise placed it in a position to effectively determine the decisions that Rose Oil made." (Id. ¶ 111). As a result, plaintiffs assert, "the Bank dominated and controlled this relationship in a manner which created an obligation on its part to act in the best interest of Plaintiffs." (Id.).

20

Plaintiffs' statement that the bank cultivated a relationship of trust and confidence with Watkins and others at Rose Oil is merely conclusory. The facts as plead support only the existence of a five-year creditor-debtor relationship. Plaintiffs have not provided any facts suggesting that the relationship "cultivated" between plaintiffs' representative and RBC's bank's "relationship manager" was anything but an arms-length, ordinary debtor-creditor relationship.

The argument that the line of credit created a fiduciary duty is also without merit. Such an argument would create a fiduciary duty in every instance where a lender extended a renewable line of credit to a borrower, as long as the borrower relied on the line of credit for their business. Plaintiffs have neither claimed nor alleged facts sufficient to support a claim that RBC Bank "completely dominated and controlled their affairs," which claim would be necessary to establish a fiduciary relationship in an ordinary debtor-creditor relationship. See Multifamily Mortg. Trust 1996-1 v. Century Oaks Ltd., 139 N.C. App. 140, 146 (2000). A superior negotiating position is not synonymous with a business relationship in which a creditor is actively involved in managing the affairs of a debtor, and plaintiffs have only alleged the former, not the latter.

Nor does any sort of "special knowledge" or "access" RBC Bank had with respect to the swaps" create a fiduciary duty to plaintiffs. This argument was previously raised in Caper Corp. v. Wells Fargo Bank, N.A., and was rejected by the court in that case; this court rejects the argument for similar reasons. See Caper Corp v. Wells Fargo Bank, N.A., 578 Fed.Appx. 276, 286 (4th Cir. 2014) (citing S. Atl. Ltd. P'ship of Tenn. L.P. v. Riese, 284 F.3d 518, 533 (4th Cir. 2002)). The information asymmetry allegedly enjoyed by RBC Bank "does not give rise to a concomitant duty for [RBC Bank] to put the interests of [plaintiff], a corporation with equal bargaining power dealing at arms length, ahead of its own." Id. RBC Bank was not acting as an agent who had a duty to

plaintiffs, as a broker, financial advisor, or insurance agent might have, but was offering plaintiffs a financial package, which plaintiffs could accept or reject on their own terms.

For the foregoing reasons, to the extent that the waiver may not apply to claims one, two, and four, they must be dismissed for failure to state a claim.

c.  Constructive Fraud: Claim Two

In order to support a claim of constructive fraud, plaintiffs must show "they and defendants were in a relation of trust and confidence . . . which led up to and surrounded to consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust." Barger v. McCoy Hillard & Parks, 346 N.C. 650, 666 (1997) (quoting Rhodes v. Jones, 232 N.C. 547, 549 (1950)).  Further, "it is not sufficient for plaintiff to allege merely that defendant won his trust and confidence and occupied a position of dominant influence over him." Rhodes v. Jones 232 N.C. 547, 548, 549 (1950).   Instead, plaintiffs must "allege the facts and circumstances which created the relation of trust and confidence." Id. at 549.

As previously discussed, plaintiff's assertion that the bank cultivated a relationship of trust and confidence with Sam Watkins and others at Rose Oil is merely conclusory. Moreover, there were two actions described as "constructive fraud," one alleging excessively high Swap rates, and the other relating to the termination fee.  Those events relating to the formation of both the swaps and the line of credit occurred at the start of the business relationship.  This gave RBC Bank little time to "cultivate a relationship of trust and confidence" prior to these transactions.  To the extent that the constructive fraud is alleged to have occur due to being forced into these fees due to the termination of the line of credit, these claims were waived as relating to the Obligations.

Therefore, to the extent it may not be subject to the waiver, claim two must be dismissed for failure to state a claim.

        d.      Unfair Trade Practices: Claim Ten

To state a prima facie claim under the North Carolina Unfair and Deceptive Trade Practices Act ("UDPA"), plaintiffs must show: 1) that defendant engaged in conduct in or affecting commerce; 2) the conduct was unfair or deceptive; and 3) plaintiffs suffered "actual injury as a proximate cause of defendant's deceptive statement or misrepresentation." Gilbane Bldg. Co. v. Fed. Reserve Bank, 80 F.3d 895, 902 (4th Cir. 1996) (citing Pearce v. American Defender Life Ins. Co., 316 N.C. 461 (1986)); N.C. Gen. Stat. § 75-1.1. An act is unfair if it is "unethical or unscrupulous," and an act is deceptive if it has a "tendency or capacity to deceive." Dalton v. Camp, 353 N.C. 647 at 656 (2001). "Occurrence of the alleged conduct, damages, and proximate cause are fact questions of the jury, but whether the conduct was unfair or deceptive is a legal issue for the court." Gilbane Bldg. Co. v. Fed. Reserve Bank, 80 F.3d 895, 902 (4th Cir. 1996). Moreover, a party must allege "substantial aggravating circumstances" to support a claim for unfair and deceptive trade practices. Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998).

Claim ten does not identify any particular acts as unfair or deceptive, but incorporates the factual basis of the prior nine claims. Plaintiffs' briefing specifically cites to the claims for fraud, breach of fiduciary duty, and constructive fraud as the factual basis for the UDPA claim. Because plaintiffs have waived any remedy for those claims dealing with the Obligations, the UDPA claim can only apply at most to the factual circumstances surrounding the swaps.

In a business context, an act is determined to be unfair based on the likely effect on "the average businessperson." See RD & J Props v. Lauralea-Dilton Enters., LLC., 165 N.C.App. 737,

23

748 (2004). An act is unfair when it "amounts to an inequitable assertion of its power or position."
Id.

Accepting as true plaintiffs' assertion that plaintiffs were offered the market rate, plaintiffs cannot assert that this claim was "deceptive" where plaintiffs not only made no attempts to investigate the veracity of this claim, but have not sufficiently alleged that the claims surrounding the swaps were untrue. While plaintiffs have alleged that they assumed the meaning of "market rate" was one where RBC Bank would only receive a small profit, plaintiffs have not alleged any facts supporting their claim that what the rate received was not actually the market rate.

In addition, the statements allegedly made by RBC Bank about the swaps were not of the sort to deceive a reasonable business person. The swaps disclosed the rates plaintiffs would pay. (DE 8-2, 3, 4, 5, 6). Plaintiffs could have investigated to determine whether or not the rates they were offered by RBC were at the market rate. While this can be waived where a fiduciary duty exists, plaintiffs have not alleged facts supporting their assertion that anything other than an ordinary arms-length business relationship existed between the two parties at the time the swaps were formed. See Branch Banking & Trust v. Thompson, 107 N.C. App. 53, 60 (1992).

Nor were the actions of defendant or RBC Bank unfair. The terms of the swaps and loans were clearly stated on the face of the documents, and those terms included the rates plaintiffs would pay. Receiving those payments, and receiving the termination fee were fully within defendant's contractual rights. While plaintiffs have stated that the circumstances under which the termination fee was paid were coercive due to the withdrawal or reduction of the line of credit, plaintiffs have waived all claims relating to the line of credit. Plaintiffs do not claim that they were in any other way coerced or inequitably pressured into accepting the swaps.

24

In sum, to the extent that claim ten is not subject to the waiver, it must be dismissed for failure to state a claim.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss (DE 7) is GRANTED. The court DENIES plaintiffs' motion for hearing (DE 24) because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process. The clerk is DIRECTED to close the case.

SO ORDERED, this the 29th day of January, 2016.

LOUISE W. FLANAGAN
United States District Judge